# EXHIBIT G

Case 5:07-cv-04151-JF    Document 18-8    Filed 02/08/2008    Page 1 of 6

# UNIVERSITY OF CALIFORNIA, SANTA CRUZ

BERKELEY · DAVIS · IRVINE · LOS ANGELES · MERCED · RIVERSIDE · SAN DIEGO · SAN FRANCISCO     SANTA BARBARA · SANTA CRUZ



EQUAL EMPLOYMENT OPPORTUNITY/                  SANTA CRUZ, CALIFORNIA 95064
AFFIRMATIVE ACTION OFFICE

November 23, 2005

To:    Mr. Courtney Blackburn

From:   Patti Hiramoto
        Director, EEO/AA

Attached please find the investigation report of your complaint filed with Equal Employment Opportunity/Affirmative Action on September 15, 2005. The investigation and report were done by Ms Julia Armstrong-Zwart.

We will be able to discuss the findings at our meeting today.

I was contracted by the Office of Equal Opportunity and Affirmative Action to carry out a fact-finding investigation of Courtney Blackburn's formal complaint of discrimination based on his race (African-American), his color, and his age (54 years.) Mr. Blackburn has been employed in the Office of Physical Education, Recreation and Sports (OPERS) as an instructor since November 1980, first as a casual 9-month employee and later, a half-time career employee. His complaint is as follows:

> "I do not know when it began. I can only describe it by the results that it is both continuing discrimination and retaliation, after 26 years teaching; two programs that could add up to fulltime 15 years; past [sic] over for promotions to higher positions; 20 years before receiving halftime benefits and after 26 years, I am still a part timer. It seems I am not allowed to succeed. I am only looking for what any career teacher would expect. A teacher with my years of commitment and more, with so little to show for it now, but not for a lack of contribution."

As stated in his complaint, he does not know when the alleged discrimination began. The only specific action that he identifies as discriminatory or retaliatory is his having been passed over for promotion to higher positions. He does not name specific individual(s) who might have discriminated or retaliated against him. When I met with Mr. Blackburn on August 30, 2005, before he filed a formal complaint, he said that he would send me electronic copies of emails that he thought would be relevant to his concerns and copies of the self assessments he had handed in as part of his annual performance evaluation. He again mentioned his intention to do so in an email he sent to me on the following day. On October 17, 2005, in an email, I asked Mr. Blackburn if he still intended to send me this material. I have made three requests to Mr. Blackburn for additional information. I have had no response from Mr. Blackburn as of this date to the last two requests and so must rely solely upon the allegations in his complaint statement.

<u>Courtney Blackburn's career in OPERS</u>

Mr. Blackburn was hired as a casual 9-month employee to teach two sections of Tai Chi Chuan (six hours of class per week with three hours of prep time) each quarter for the 1980/81 academic year, with his appointment ending June 30, 1981. Each academic year from that initial hire until January 1999, Mr. Blackburn was rehired in September, and his employment came to an end the following June 30. In March 1995 Mr. Blackburn applied for the vacant position of Fencing Instructor and was hired Spring quarter to teach two sections of Fencing each quarter (four hours of class with two hours of prep time). This was in addition to the Tai Chi sections, and, as with the Tai Chi appointment, Mr. Blackburn was rehired each September in an appointment that ended on June 30. With a 100%-time appointment based on 40 hours per week for 12 months, Mr. Blackburn's appointment at 15 hours per week for 9 months to teach Tai Chi and Fencing represented a 28.73%-time appointment.

Mr. Blackburn's OPERS salary was "by agreement" (BYA), which meant that since he was a casual 9-month employee, his salary was not tied to a system of steps but rather was at or above the minimum salary paid for the position classification. His salary was subject to range adjustment over the years, so that while his first salary was $2244 for the initial appointment, it had increased to $4221.45 by the time he was hired as Fencing Instructor, at which time his salary for teaching Tai Chi and Fencing was increased to $6916.50. In 1988, all of the OPERS staff in the Recreation Program Instructor title was reclassified downward to PE Instructor I. Since Mr. Blackburn's salary was higher than the maximum of the new classification, his salary was "red-circled". This meant that his salary was not lowered but would remain at the same level until the salary range of the new classification caught up with it, after which his salary would be range-adjusted. One other individual was similarly circumstanced and was treated the same. Casual employees,

such as the less than 50%-time PE Instructors, are not eligible for merit increases so that range adjustments and increases in %-time are the sources of salary increases. In 1996 Mr. Blackburn received an upward reclassification to PE Instructor II, which made him an exempt employee and increased his BYA salary to $7918.20.

In November 1998 Mr. Blackburn's instructional load for Winter quarter 1999 was increased by another Fencing class, which brought him to 50%-time on a 9-month basis and made him eligible for merit increases and benefits. At first, the appointment still had an end date of June 30, 2000, because the funding source for the increase was not permanent. In December 1999, however, permanent funds were found, and the position was upgraded to an indefinite end date. The position would be furloughed without pay or employer-paid health insurance each summer, but there would no longer be the possibility of not being rehired each September. All OPERS career PE Instructors are furloughed without pay during the summer and must arrange to pay for the continuation of their health insurance during the period of furlough. The unit made an effort to find funds to bring Mr. Blackburn's appointment to 50%-time because he was a longtime employee who now had a family and had asked OPERS if anything might be done to provide him with benefits.

Mr. Blackburn's job performance was rated as "met all expectations", and he received merit increases of 3.5% in 1999 and 2000 and a 2% merit in 2001, a year in which everyone who received a merit increase received the same 2%. The campus did not have merit increases for staff from 2002-2005. As of 2003, Mr. Blackburn's salary was $14,177. Mr. Blackburn was awarded a $450 Incentive Award in August 2004 "in appreciation of valuable contributions made toward a successful year in OPERS."

Comparable OPERS Staff

In the course of this investigation, I interviewed persons and reviewed personnel files relevant to this case.

Resources in OPERS

OPERS is a resource-driven unit, i.e., the number of PE courses that can be offered in any one year is strictly determined by the amount of funding available. A PE instructor's percent-time is determined by the number of weekly class hours plus one half hour of prep time for each hour taught. In order to be considered a career employee with no end date, a PE Instructor's position must be at 50% or more, i.e., a weekly teaching and prep load of at least 20 hours, and be funded from a permanent fund source. Permanent funds are a closely controlled funding resource.

Decision-making in OPERS

Within the constraints of available resources, OPERS used criteria in the past as general guidelines to determine how many sections could be offered in each of eight areas: Aquatics, Boating, Court Sports, Dance, Fencing, Field Sports, Physical Conditioning, and Martial Arts. OPERS used four criteria, ranked from 1 to 4 or 5, to determine what classes would be taught and who would teach them. Competitive courses were not included in this review. The criteria, developed in 1983, are the following:

1. FACULTY -- Employment status of faculty
   Academic              4
   Staff -- Career       3
   Staff -- Limited Career 2

2

    Casual                  1

2. FACILITIES – Nature and availability of facilities of instructional area
   Excellent        5
   Good             4
   Average          3
   Fair             2
   Poor             1

3. EXPENSE – Operational cost of program
   None             5
   Little           4
   Some             3
   Much             2
   Very much        1

4. APPEAL – Numbers of students enrolled and turned away
   Great            5
   Much             4
   Some (meets campus needs)   3
   Little           2
   Very little      1

In addition to these criteria, OPERS faculty and instructors considered diversity of offerings and, most importantly, the relationship of the class to overall health and wellness. When considering whether to expand PE classes, a combination of available funding, student interest, and facility availability came into play.

## Findings

After careful investigation, I have found no evidence to support Mr. Blackburn's complaint of discrimination on the basis of his race, color, or age. He was clearly a part-time, casual 9-month employee from his initial hire in November 1980 until he was made a half-time career employee in January 1999. All of the appointment documents stated specifically that each 9-month appointment began in September of one year and ended without promise of rehiring at the end of the following June. All of the comparables considered had initial part-time, casual 9-month hires at a greater percent-time than Mr. Blackburn's, based on the number of sections offered at the time of hire, thus making it possible for them to become part- or full-time career employees with benefits at a more rapid rate than Mr. Blackburn when additional classes in their areas of expertise were offered. I found no bias in the administrative decision to keep Tai Chi and Fencing instruction at their current levels, given the availability of resources and the assessment of student interest in and demand for other classes. The nature and number of PE class offerings is determined by funding and student interest, rather than an instructor's interest in full-time employment. Mr. Blackburn was hired to teach Fencing, the only job other than Tai Chi instruction he applied for in OPERS. When his salary would have been lowered in a downward reclassification, it was kept at the same level. When he asked if he could be assigned another class in order to become eligible for benefits, his request was granted. Once he was eligible, he received merit increases in each year that merits were given. The amount of his merit was based on the assessment of his performance, as occurred with the comparable employees eligible

3

for merit. There was no indication in his personnel file that Mr. Blackburn was unhappy with the assessment of his performance.

This investigation was constrained because Mr. Blackburn did not identify specific actions that he believed to be either discriminatory or retaliatory; however, a review of his personnel files and those of the comparable employees provided no evidence of disparate treatment. My investigation, based on the minimal amount of information provided by Mr. Blackburn, focused on the allegations made in his formal complaint, and I found nothing to suggest that Mr. Blackburn's race, color, or age played a role in any OPERS decision that affected him. Nor was there evidence of any retaliation against him.

Submitted by Julia Armstrong-Zwart

Concurrence

*Patti Hiramoto*

Patti Hiramoto
Director, EEO/AA

4

000347